# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
## CLARKSBURG

**PAULA L. LEONARD** and
**ROBERT P. LEONARD,**

        Plaintiffs,

**v.**                                              **CIVIL ACTION NO. 1:14-CV-42**
                                                    **(Judge Bailey)**

**SARAH STARKEY, BRENDA WARE,**
**TERRY WALKER, JULIE GARVIN,**
**COTY SHINGLETON, JAMES J. MEDINA, II,**
and **WEST VIRGINIA DEPARTMENT OF**
**HEALTH AND HUMAN RESOURCES,**

        Defendants.

## MEMORANDUM OPINION AND ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION TO DISMISS

Pending before this Court is the Motion to Dismiss filed by defendants Coty Shingleton and James J. Medina, II ("Shingleton," "Medina," or "the deputy defendants") [Doc. 77], which was filed May 1, 2015. The plaintiffs filed their Response in Opposition [Doc. 81] on May 18, 2015. The deputy defendants filed their Reply brief [Doc. 84] on May 22, 2015. Subsequently, this Court ordered the plaintiffs to submit a more definite statement [Doc. 87], which the plaintiffs filed on August 31, 2015 [Doc. 88]. This matter is now ripe for adjudication. For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** defendants Shingleton and Medina's Motion to Dismiss **[Doc. 77]**.

## BACKGROUND

**A.    Factual Background**

Robert Leonard ("Mr. Leonard") and Paula Leonard ("Mrs. Leonard") filed a petition in the Circuit Court of Harrison County, West Virginia, alleging parental abuse and/or neglect of the Leonards' two grandchildren.  Julie Garvin ("Garvin") was appointed as the guardian *ad litem* for the children in the action ("the child abuse case"), and Sarah Starkey ("Starkey") and Brenda Ware ("Ware") were Child Protective Services ("CPS") workers assigned by their supervisor, Terri Walker ("Walker"), to the case [Doc. 50 at ¶ 4].  Upon conclusion of the child abuse case, the Leonards were granted physical custody of their grandchildren; the Leonards did not receive legal custody. [Id.].

The Leonards allege that "defendants Garvin and Starkey, and possibly Walker," had planned for Starkey to conduct a home visit without notice prior to March 14, 2012; Mr. Leonard refused entry, and "later asserted in court papers filed in the child abuse case . . . that he has a constitutional right to refuse a government agent's entry into his home if the agent does not have a warrant or court order authorizing the entry."  [Id.].

Following Starkey's unsuccessful home visit, Starkey, Ware, and Garvin planned to "remove the children from the Leonards' lawful court-ordered physical custody by force aided by the assistance of law enforcement under color of CPS authority" [id. at ¶ 5], with "the approval of and under the direction of defendant Walker."  [Id.].  Of import, on March 9, 2012, defendant Garvin reported the alleged "imminent danger" the plaintiffs posed to the children, yet no action was taken until five days later on March 14.  This Court also notes that defendant Garvin, in her Motion to Dismiss, states that "abuse *may* have been occurring . . .." [Doc. 72 at p. 12] (emphasis added).

2

Starkey called the Harrison County Sheriff's Department, identified herself as a CPS worker, and requested assistance in the removal, indicating that "she anticipated problems at the residence." [Id.]. Harrison County Deputy Sheriffs Shingleton and Medina were sent to meet Starkey, Ware and Garvin in the parking lot behind the Harrison County Courthouse to accompany them to the Leonards' home. [Id.]. The defendants all arrived at the Leonards' home around 6:21 p.m. [Id.]. The deputy defendants each arrived in their law enforcement vehicles, while Starkey, Ware and Garvin arrived in one car together. [Id.]. The deputy defendants, who were in their uniforms and armed, approached the Leonards' home, where Mr. Leonard was present. [Id. at ¶ 6]. The deputies asked Mr. Leonard to exit the home, but he refused. [Id.].

The deputies then opened the front door, reached inside, and forcibly removed Mr. Leonard from the residence. [Id.]. Once outside, the deputies handcuffed and searched Mr. Leonard. [Id.]. The Leonards allege that one of the two deputies "intentionally and maliciously choked" Mr. Leonard while he was restrained on the ground. [Id. at ¶ 7].[1]

After Mr. Leonard was restrained, Starkey, Ware, and Garvin entered the home and seized personal property, without the consent of the Leonards or other authorization.[2] [Id.].

---

[1] The Leonards do not specify which of the deputies "intentionally and maliciously choked" Mr. Leonard [Doc. 50 at ¶ 7].

[2] It is unclear what was seized from the Leonards' home, as the only fact alleged in relation to this claim states that, "defendants Starkey, Walker [sic] and Garvin, working in concert . . . seized items of personal . . . and they then left the residence with the property" [Doc. 50 at ¶¶ 7-8]. Defendants, however, allude to taking the grandchildren's belongings in their brief. Plaintiffs' More Definite Statement does, however, allege "Starkey, Ware and Garvin . . . seized items of personal property belonging to the plaintiffs." [Doc. 88 at 7].

Garvin and Shingleton took the children directly to the Harrison County Courthouse for emergency removal proceedings pursuant to W.Va. Code § 49-6-3(c). [Id.].

## B.    Procedural Background

On March 12, 2014, the Leonards filed suit in this Court against Starkey, Ware, Walker, Garvin, Shingleton, Medina, and the West Virginia Department of Health and Human Resources ("WVDHHR")  [Doc. 1].  On October 7, 2014, Judge Irene M. Keeley[3] heard oral argument on the previous motions to dismiss [Doc. 43], and denied the same without prejudice. [Id.].  The Court ordered the Leonards to file an amended complaint, [Id. at 2], which they did on December 1, 2014, alleging the following [Doc. 50]:

- •    **Counts 1 and 2:** Violation of the Leonards' right to be free from unreasonable searches and seizures under the Fourth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983 (against Starkey, Ware, Walker, Garvin, Shingleton and/or Medina);

- •    **Counts 3 and 4:** Intentional Infliction of Emotional Distress (against Starkey, Ware, Walker, Garvin, Shingleton, and/or Medina);[4]

- •    **Count 6:** Assault and Battery (against Shingleton and/or Medina);

- •    **Count 7:** Civil Conspiracy (against Starkey, Ware, Walker, Garvin, Shingleton, and Medina); and

- •    **Count 8:** Vicarious Liability (against defendant WVDHHR).

---

[3]  This matter was transferred to the undersigned judge on September 22, 2015 [Doc. 90].

[4] There is no "Count 5" listed in the Amended Complaint.

On May 1, 2015, defendants Medina and Shingleton filed the instant Motion to Dismiss, arguing that the Leonards did not plead sufficient facts to state a claim upon which relief can be granted, or to overcome the defendants' statutory and qualified immunity.

## LEGAL STANDARD

In reviewing the sufficiency of a complaint under Fed. R. Civ. P. 12(b)(6), a district court must accept the factual allegations in the complaint as true. *Zak v. Chelsea*, 780 F.3d 597, 601 (4th Cir. 2015)(citing *Matrix Capital Mgmt. Fund, LP v. Bearing Point, Inc.*, 576 F.3d 172, 176 (4th Cir. 2009)). While a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Indeed, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 2944 (1986).

A complaint must be dismissed if it does not allege "'enough facts to state a claim to relief that is *plausible* on its face.' *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007) (emphasis added)." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This requires "more than a sheer possibility that a defendant has acted unlawfully." *Id*. However, when reviewing the sufficiency of a complaint, a court may also consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor*

*Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A court may consider documents attached to a motion to dismiss when they are "integral to and explicitly relied on in the complaint and . . . the plaintiffs do not challenge [their] authenticity." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004).

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). "But in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)," so long as "all facts necessary to the affirmative defense 'clearly appear[] on the face of the complaint.'" *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)). The Supreme Court of the United States has repeatedly stressed "the importance of resolving immunity questions at the earliest possible stage in litigation . . .." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *see Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011) ("Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims therein, dismissal nevertheless is appropriate when the face of the complaint clearly reveals the existence of a meritorious affirmative defense.").

<u>**ANALYSIS**</u>

The Leonards' Amended Complaint [Doc. 50] alleges the following claims against defendants Shingleton and Medina: (1) violations of their Fourth and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983; (2) intentional infliction of emotional distress; (3) assault and battery; and (4) civil conspiracy. First, Shingleton and Medina argue that the Leonards' state law claims are barred by statutory immunity pursuant to the West Virginia Governmental Tort Claims and Insurance Reform Act, W.Va. Code § 29-12a-5(b) (the "Act"). Second, Shingleton and Medina contend that the Leonards have failed to state a § 1983 claim, or in the alternative, that they are entitled to qualified immunity. Third, they argue that the Leonards have failed to state plausible claims of intentional infliction of emotional distress and assault and battery. Finally, Shingleton and Medina argue that because the Leonards have failed to state any plausible tort claim, the claim of civil conspiracy must fail as a matter of law.

As to any new allegations or claims raised in the Leonards' response to the motion to dismiss, this Court will not consider them for the purposes of resolving the pending motion. *See **Occupy Columbia v. Haley***, 738 F.3d 107, 116 (4th Cir. 2013) ("In resolving a motion pursuant to Rule 12(b)(6) . . ., a district court cannot consider matters outside the pleadings without converting the motion into one for summary judgment"); ***Imagine Medispa, LLC v. Transformations, Inc.***, 999 F.Supp.2d 873, 879 (S.D. W.Va. 2014) (refusing to consider new allegations in resolving a motion to dismiss where the plaintiffs had not moved to amend their complaint to include such allegations). This Court will,

however, consider the Plaintiffs' More Definite Statement [Doc. 88] as it was Court-ordered and no defendant has challenged it.

## A.    Statutory Immunity

Shingleton and Medina argue that they are entitled to statutory immunity as to the state law claims pursuant to the Act.  W.Va. Code § 29-12A-5(b).  Statutory immunity "is an immunity from suit rather than a mere defense to liability [that] . . . is effectively lost if the case is erroneously permitted to go to trial." *Hutchison v. City of Huntington*, 198 W. Va. 139, 147, 479 S.E.2d 649, 657 (1996) (internal citations omitted).  "[I]mmunities under West Virginia law are more than a defense to a suit in that they grant governmental bodies and public officials the right not to be subject to the burden of trial at all.  The very heart of the immunity defense is that it spares the defendant from having to go forward with an inquiry into the merits of the case." *Id.*

"The ultimate determination of whether . . . statutory immunity bars a civil action is one of law for the court to determine." *State ex rel. Town of Pratt v. Stucky*, 229 W. Va. 700, 706, 735 S.E.2d 575, 581 (2012).  Under the Act, "[a] political subdivision is immune from liability if a loss or claims results from . . . the failure to provide, or the method of providing, police, law enforcement or fire protection." W.Va. Code § 29-12A-5(a)(5).  A political subdivision is defined as follows:

> [A]ny county commission, municipality and county board of education; any separate corporation or instrumentality established by one or more counties or municipalities, as permitted by law; any instrumentality supported in most part by municipalities; any public body charged by law with the performance of a government function and whose jurisdiction is coextensive with one or more counties, cities or towns; a combined city-county health department

created pursuant to article two, chapter sixteen of this code; public service districts; and other instrumentalities including, but not limited to, volunteer fire departments and emergency service organizations as recognized by an appropriate public body and authorized by law to perform a government function: Provided, That hospitals of a political subdivision and their employees are expressly excluded from the provisions of this article.

W.Va. Code § 29-12A-3(c).

The Harrison County Sheriff's Department qualifies as a political subdivision under the Act as a public body "charged by law with the performance of a government function." *See* ***State ex rel. City of Bridgeport v. Marks***, 223 W. Va. 449, 455, 759 S.E.2d 192, 198 (2014). An employee of a political subdivision is immune from liability unless: "(1) his acts or omissions were manifestly outside the scope of employment or official responsibilities; (2) his . . . acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or (3) liability is expressly imposed upon the employee by a provision of this code." W.Va. Code §§ 29-12A-5(b)(1)-(3).

An employee behaves in a wanton or reckless manner when he or she "has intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." ***Holsten v. Massey***, 200 W. Va. 775, 789, 490 S.E.2d 864, 878 (1997). The Supreme Court of Appeals of West Virginia has previously defined "malice" as "[t]he intentional doing of a wrongful act without just cause or excuse, with an intent to inflict injury or under circumstances that the law will imply an evil intent . . . A condition of the mind showing a heart regardless of social duty and fatally bent on

9

mischief." *State v. Burgess*, 205 W. Va. 87, 89, 516 S.E.2d 491, 493 (1999) (quotations omitted).

In *Hylton v. Bennett*, No. 12-0194, 2012 WL 5834621, at *2 (W. Va. Nov. 16, 2012), the Supreme Court of Appeals of West Virginia affirmed the circuit court's dismissal with prejudice where the defendants were entitled to statutory immunity from the claims. *Id.* The Supreme Court concluded that, "[a]lthough petitioners allege in their complaint that respondents [engaged in allegedly unlawful behavior] 'maliciously and without probable cause . . .' the Complaint is devoid of any factual assertions to support this bald claim of malice[,]" and thus the respondents were entitled to statutory immunity. *Id.*

The Leonards expressly allege that "at all times material to the Claims made herein [defendants Medina and Shingleton were] employed by Harrison County, West Virginia as . . . Harrison County Deputy Sheriff[s]." [Doc. 50 at ¶¶ 3, 11-12]. Accordingly, the Leonards expressly "do not dispute that the defendant deputies are employees of a 'political subdivision' as defined by the statute." [Doc. 81 at 6].

### i. Assault & Battery

The Leonards contend that the "[a]ctions of defendants Medina and Shingleton alleged above . . . were intentional and malicious acts engaged in by them to cause Mr. Leonard to suffer imminent apprehension of harmful or offense physical contact and to cause him to suffer harmful or offensive physical contact." [Doc. 50 at ¶ 30]. The Leonards further allege that "one of the deputies intentionally and maliciously choked Mr. Leonard." [Id. at ¶ 27].

The Leonards have alleged that Shingleton and Medina knew that they did not have a warrant or other justification when they seized, handcuffed and choked Mr. Leonard. Accepting the facts alleged in the Amended Complaint as true, the Leonards have pleaded sufficient facts to support a plausible finding that the deputy defendants were acting with malicious purpose or in bad faith. At this stage, the facts do not support a finding that the deputy defendants are entitled to statutory immunity from this claim, and the Court **DENIES WITHOUT PREJUDICE** Medina and Shingleton's Motion to Dismiss based on this theory.

### ii. Intentional Infliction of Emotional Distress

The Leonards allege that the "[a]ctions of defendants Medina and Shingleton alleged above . . . were extreme and outrageous . . . [and] were engaged in by them for the purpose of intentionally and maliciously inflicting emotional distress and outrage to the Leonards or were engaged by them in reckless disregard that their conduct was substantial [sic] certain to cause the Leonards emotional distress and outrage . . . ." [Doc. 50 at ¶ 30]. In support of this, the Leonards state that "based on the allegations in the Amended Complaint- that without justifiable cause, the deputies invaded the sanctity of a private home, grabbed the homeowner and forcibly pull [sic] him outside, took him to the ground and put him in handcuffs, and then choked him . . .." [Id. at ¶ 27].

The Leonards have alleged that Medina and Shingleton acted maliciously or with reckless disregard that their conduct would cause the Leonards emotional distress. In support, the Leonards contend that Medina and Shingleton knew that they did not have a warrant, consent, or authorization when they seized Mr. Leonard inside his home, that despite knowing that the Leonards had not and would not consent, and that one of the

deputies choked Mr. Leonard. On that basis, it could reasonably be inferred that Medina and Shingleton had acted maliciously under West Virginia law, because they had committed an unlawful act without just cause or authorization. Accordingly, at this point this Court cannot determine that Medina and Shingleton are entitled to statutory immunity under W.Va. Code § 29-12A-5(b), and it **DENIES WITHOUT PREJUDICE** the Motion to Dismiss based on this theory.

### iii. Civil Conspiracy

The Leonards argue that the "[a]ctions of defendants Medina and Shingleton alleged above . . . were unlawful acts in furtherance of an unlawful conspiracy to commit such unlawful acts between themselves and with defendants Starkey, Ware, and Garvin" and that "the actions of defendants Medina, Shingleton, Starkey, Ware and Garvin at the Leonard's residence on March 14, 2012, as alleged above, were acts in furtherance of that conspiracy." [Doc. 50 at ¶¶ 8, 11].

A "civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means. The cause of action is not created by the conspiracy but by the wrongful acts done by the defendants to the injury of the plaintiff." *Kessel v. Leavitt*, 204 W. Va. 95, 128, 511 S.E.2d 720, 753 (1998). Thus, Medina and Shingleton are entitled to statutory immunity unless the Leonards have alleged facts to show that they conspired to commit assault and battery, or conspired to commit intentional infliction of emotional distress, and that this conduct was with malicious purpose, bad faith, or wanton or reckless behavior. *See Mallamo v. Town of Rivesville*, 197 W. Va. 616, 623, 477 S.E.2d 525, 532 (1996)

(finding that police chief would not be immune from liability if a conspiracy to conceal the facts surrounding a shooting incident were proven because such concealment would be outside the scope of his employment, with malicious purpose, and in bad faith).

The Leonards allege that "defendants Starkey, Ware and Garvin met with defendant Medina and/or with defendant Shingleton in the parking lot behind the Harrison County Courthouse in Clarksburg, and they conspired and planned to carry out a surprise raid on the Leonards at their home without any prior notice to either of the Leonards . . .." [Doc. 50 at ¶ 20]. If the defendants conspired to commit either of the above torts, the action would certainly be in bad faith or with malicious purpose. At this time, the defendants are not entitled to statutory immunity, and the Court **DENIES** the Motion to Dismiss based on this theory.

**B. Qualified Immunity**

Medina and Shingleton argue that the Leonards' § 1983 claims must be dismissed because: (1) the Leonards' allegations fail to support a § 1983 claim because they do not identify a Constitutional right that was violated; or (2) qualified immunity bars the claim. Section 1983 allows for a plaintiff to assert a claim against any "person" who, acting under color of state law, "depriv[ed] [another] of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. A plaintiff seeking to bring a claim under § 1983 must meet two requirements: (1) the conduct complained of was committed by a person acting under color of law; and (2) the conduct deprived the plaintiff of rights, privileges, or immunities secured to him by the Constitution and the laws of the United States. *See*

*Wirth v. Surles*, 562 F.2d 319, 321 (4th Cir. 1977) (citing *Monroe v. Pape*, 365 U.S. 167 (1961)).

"Qualified immunity protects an officer from liability or, in many instances, from having to stand trial when the officer makes a decision that even if constitutionally deficient, 'reasonably misapprehends the law governing the circumstances she confronted.'" *Hutchinson v. Lemmon*, 436 Fed.Appx. 210, 214 (4th Cir. 2011) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). "[A] plaintiff may prove that an official has violated his rights, but an official is nonetheless entitled to qualified immunity if a reasonable person in the official's position could have failed to appreciate that his conduct would violate those rights." *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991). This is particularly important in the law enforcement field, where the ability of police officers "to protect the public can be severely hampered . . . if their every decision is subject to second-guessing in a lawsuit." *Id*. Accordingly, qualified immunity acts to protect "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

As an initial matter, taking the well-pleaded facts in the Amended Complaint as true, this Court must identify whether any statutory or constitutional rights were violated and then ask whether those rights were clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Hunter v. Town of Mocksville, N.C.*, __ F.3d __, 2015 WL 3651646, at *4 (4th Cir. 2015). This Court, in its discretion, may decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the

circumstances in the particular case at hand." *M.C. ex rel. Crawford v. Amrhein*, 598 Fed.Appx. 143, 146 (4th Cir. 2015) (citing *Pearson*, 555 U.S. at 236).

### 1. Unreasonable Search

The Leonards allege that "[w]hen the deputies, without a warrant or exigent circumstances as alleged, opened the door and entered the sanctity of the home of Mr. Leonard <u>and</u> Mrs. Leonard in order to grab and pull Mr. Leonard from the home . . . the deputies . . . violated the expectations of privacy [the Leonards] have in their home against any warrantless intrusion." [Doc. 81 at 16] (emphasis in original). On this basis, the Leonards argue that Mrs. Leonard has plausibly alleged a Fourth Amendment violation against the deputies under § 1983. [Id.].

### i. Clearly Established Right

Fourth Amendment protections are triggered when the state intrudes into an area "in which there is a 'constitutionally protected reasonable expectation of privacy.'" *New York v. Class*, 475 U.S. 106, 112 (1986) (citing *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)). "Because individuals ordinarily possess the highest expectation of privacy within the curtilage of their home, that area typically is 'afforded the most stringent Fourth Amendment protection.'" *United States v. Taylor*, 90 F.3d 903, 908 (4th Cir. 1996) (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976)). "With few exceptions, the question of whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (citations omitted).

The right to be secure in one's home from warrantless and forcible intrusion in the absence of exigent circumstances is clearly established. In **Payton v. New York**, 445 U.S. 573, 590 (1980), the Supreme Court stated that "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not be reasonably crossed without a warrant." **Id**. Thus, at the time of the intrusion, there was clearly established law from the Supreme Court prohibiting Medina and Shingleton's admittedly minimal entry into the Leonards' home without a warrant or exigent circumstances.

### ii. Violation of Constitutional Right

The Leonards claim that their constitutional rights were violated when Medina and Shingleton, acting under color of state law, entered their home without a warrant, exigent circumstances, or other authorization, in violation of the Fourth Amendment. "It is a 'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" **Brigham City v. Stuart**, 547 U.S. 398, 403 (2006) (quoting **Groh v. Ramirez**, 540 U.S. 551, 559 (2004)). However, "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." **Id**. at 403. Notably, "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify the action." **Id**. at 404 (citations omitted). "[A] search or seizure carried out on a suspect's premises without a warrant is *per se* unreasonable, unless the police can show . . . the presence of 'exigent circumstances.'" **Coolidge v. New Hampshire**, 403 U.S. 443, 474-75 (1971). An "exigent circumstance"

exists when "real immediate and serious consequence" could occur if the police delay their action in order to obtain a warrant. *Welsh v. Wisconsin*, 466 U.S. 740, 751 (1984) (citations omitted).

"In analyzing whether exigent circumstances justified a warrantless search, we ask whether the circumstances would cause an officer to have an 'objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within.'" *United States v. Hill*, 649 F.3d 258, 265 (4th Cir. 2011) (quoting *United States v. Moss*, 963 F.2d 673, 678 (4th Cir. 1992)). The Supreme Court has specifically identified exigencies that may justify a warrantless search of a home. *Kentucky v. King*, 563 U.S. 452 (2011); *see, e.g., Ker v. California*, 374 U.S. 23, 40 (need "to prevent the imminent destruction of evidence" is sufficient justification for a warrantless search); *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (warrantless entry was permissible to render emergency assistance to an injured person or to protect an occupant from imminent injury); *United States v. Santana*, 427 U.S. 38, 42-43 (1976) (warrantless entry permissible when officers are in hot pursuit of fleeing suspect).

In *United States v. Turner*, 650 F.2d 526 (4th Cir. 1981), the Fourth Circuit provided enumerated factors relevant to a district court's determination of exigent circumstances:

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors or the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband.

*Turner*, 650 F.2d at 528 (citing ***United States v. Rubin***, 474 F.2d 262, 268 (3d Cir. 1973)).

The Fourth Circuit has also acknowledged a narrow class of constitutionally permissible warrantless searches in the "preventative action" context. *See **Mora v. City of Gaithersburg***, 519 F.3d 216, 222 (4th Cir. 2008). "In circumstances that suggest a grave threat and true emergency, law enforcement is entitled to take whatever preventative action is needed to defuse it." *Id*. at 225. In ***Mora***, a warrantless search of a suspect's possessions and apartment was held to be constitutionally permissible based on an overwhelming need to prevent harm to the public where the police had received a specific tip that the suspect was planning to commit mass murder. *Id*. The Court emphasized that, "[a]s the likelihood, urgency, and magnitude of a threat increase, so does the justification for and scope of police preventative action." *Id*. at 224.

However, in ***United States v. Yengel***, 711 F.3d 392, 399 (4th Cir. 2013), the Fourth Circuit held that an officer's belief that there was a grenade in the home was insufficient to justify a warrantless search. The Court held that "[t]he stable nature of the threat, the immobile and inaccessible location of the threat, and the failure by police officers on site to view the threat as serious enough to warrant evacuation of a nearby child, alone, support our conclusion under the ***Turner*** factors that no exigency existed in this case." *Id*. In reaching this decision, the Court distinguished the case from ***Mora***, and stated:

> Key to our holding in ***Mora*** was that the police officers' arrival at the scene was predicated upon precise, articulable information that the suspect was about to commit mass murder- a crime of extraordinary consequence. Here, police officers were responding to a report of an armed domestic assault, which, although certainly no less deplorable, is not accompanied by the same

gravity of harm as a mass killing. The heightened potential in **Mora** for deliberate and massive public harm increased the exigency and distinguishes it from the present case.

**Yengel**, 711 F.3d at 399.

The Court then concluded that in **Mora** the "police officers were concerned about unknown variables that could reasonably accompany a threat of mass murder- bombs, accomplices, and hostages- based on the information they had at the time," while under the facts of **Yengel**, "[t]here [was] no similar indication . . . that the domestic assault, in the context of the facts as they unfolded, would carry with it these same dangers." **Id**. at 400.

Medina and Shingleton were dispatched for an emergency removal pursuant to W.Va. Code § 49-6-3(c), which applies when a child is in imminent danger of further abuse and there are no available alternatives [Doc. 50 at ¶ 5].[5] A social worker had informed the dispatcher "that she anticipated problems at the residence," and when Medina and Shingleton arrived at the home and requested that Mr. Leonard come outside, Mr. Leonard asked if they had a warrant and then refused to exit the home. [Id. at ¶ 6]. The deputies then reached into the home and "forcibly pulled" Mr. Leonard outside to search and detain him. [Id.]. Shingleton and Medina argue that their action falls within the "preventative action" context. After accepting all factual allegations in the Amended Complaint as true,

---

[5] "If a child . . . shall, in the presence of a child protective service worker, be in an emergency situation which constitutes an imminent danger to the physical well being of the child . . ., and if such worker has probable cause to believe that the child or children will suffer additional child abuse or neglect . . ., the worker may, prior to the filing of a petition, take the child or children into his or her custody without a court order . . . ." W.Va. Code § 49-6-3(c).

there is a factual question as to whether the defendants were faced with a "grave danger and a true emergency."

"[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." ***Payton v. New York***, 445 U.S. 573, 590 (1980). Based on the facts available on the face of the Amended Complaint, Medina and Shingleton carried out a warrantless, non-consensual, unauthorized entry into the Leonards' home, with no exigent circumstances, in violation of the Leonards' Fourth Amendment right to be secure in their home from Government intrusion. Accordingly, the plaintiffs have alleged a plausible claim under Section 1983, and the Motion to Dismiss is **DENIED WITHOUT PREJUDICE** as to this claim.

## C. State Law Claims

Medina and Shingleton also argue that the Leonards have failed to state sufficient facts to support their state law claims, having pleaded only conclusory statements and legal allegations. The Leonards assert that, as to each count alleged, "[the Amended Complaint] pleads all the elements . . .." [Doc. 81].

### 1. Intentional Infliction of Emotional Distress

Under West Virginia law, to successfully plead a claim of intentional infliction of emotional distress, the plaintiff must establish:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress . . . (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and (4) that the

emotional distress suffered by the plaintiff was so severe that
no reasonable person could be expected to endure it.

*Philyaw v. Eastern Associated Coal Corp.*, 219 W. Va. 252, 258, 633 S.E.2d 8, 14

(2006) (quoting *Travis v. Alcon Laboratories*, 202 W. Va. 369, 504 S.E.2d 419 (1998)).

"Whether conduct may reasonably be considered outrageous is a legal question, and

whether conduct is in fact outrageous is a question for jury determination." *Travis*, Syl. Pt.

4, 202 W. Va. at 371, 504 S.E.2d at 421.

> "It had not been enough that the defendant has acted with an
> intent which is tortious . . . or that he has intended to inflict
> emotional distress, or even that his conduct has been
> characterized by 'malice,' . . . [l]iability has been found only
> where the conduct has been so outrageous in character, and
> so extreme in degree, as to go beyond all possible bounds of
> decency, and to be regarded as atrocious, and utterly
> intolerable in a civilized community."

*Tanner v. Rite Aid of West Virginia, Inc.*, 194 W. Va. 643, 651, 461 S.E.2d 149, 157

(1995) (quoting Restatement (Second) of Torts § 46(1) cmt. j (1965)). "[C]onduct that is

merely annoying, harmful of one's rights or expectations, uncivil, mean-spirited, or negligent

does not constitute outrageous conduct." *Courtney v. Courtney*, 186 W. Va. 597, 602,

413 S.E.2d 418, 423 (1991).

The Leonards allege "that without justifiable cause, the deputies invaded the sanctity

of a private home, grabbed the homeowner and forcibly pull [sic] him outside, took him to

the ground and put him in handcuffs, and then choked him," and that "a jury could

reasonably find . . . [that the deputy defendants' conduct] 'offends community notions of

acceptable conduct.'" [Doc. 81 at 17]. Further, the Leonards generally alleged that Medina and Shingleton's actions were intended to "intentionally and maliciously inflict[] emotional distress and outrage to [sic] the Leonards or were engaged by them in reckless disregard that their conduct was substantially certain to cause the Leonards emotional distress and outrage." [Doc. 50 at 8]. Assuming the factual allegations in the Amended Complaint are true, the Leonards have minimally pleaded facts to support the first three elements of intentional infliction of emotional distress, but none to establish the fourth.

Here, the Leonards merely allege that the "[a]ctions of defendants . . . Medina and Shingleton alleged above . . . caused each of the plaintiffs damages in the form of severe emotional distress and outrage" and that "Shingleton and/or Medina caused [the Leonards] severe emotional distress." [Doc. 50 at ¶¶ 11, 13]. These conclusory allegations of "severe emotional distress" are no "more than labels and conclusions," and merely provide a "formulaic recitation of the elements," rather than stating facts to support all elements of a plausible cause of action. *Twombly*, 550 U.S. at 555; ***Travis v. JP Morgan Chase Bank, N.A.***, No. 1:12-CV-89, 2012 WL 3193341, *5 (N.D. W.Va. Aug. 6, 2012) (holding that statements like the plaintiff "suffered severe emotional and psychological pain and stress," were simply labels and conclusions, and insufficient to plead "severe emotional distress").[6]

---

[6] *See* **Patrick v. PHH Mortg. Corp.**, 937 F.Supp.2d 773, 791 (N.D. W.Va. 2013) (internal citations omitted) ("Although Plaintiffs state in a conclusory fashion that they suffered extreme emotional distress that no reasonable person could endure, they plead no facts describing such distress, any physical, mental, or emotional injuries, any treatment, or the impact such suffering has had on their lives . . . Plaintiffs' legal conclusions and labels are insufficient to state a claim under Rule 8(a) of the Federal Rules of Civil Procedure."); *see also* **Patrick v. Teays Valley Trs., LLC**, No. 3:12-CV-39, 2012 WL 5993163 (N.D. W.Va. Nov. 30, 2012) (stating that where plaintiffs allege that defendants' actions caused the plaintiffs "severe emotional distress such that no reasonable person could be expected to endure it," with no supporting factual allegations,

Accordingly, this Court **GRANTS** Medina and Shingleton's Motion to Dismiss Counts Three and Four of the Amended Complaint.

### 2. Assault & Battery

Medina and Shingleton argue that Mr. Leonard has failed to state a claim upon which relief can be granted because he did not allege any facts to show that Medina and Shingleton used unnecessary force to detain him. In West Virginia, "[a]n actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." *W. Va. Fire & Cas. Co. v. Stanley*, 216 W. Va. 40, 51, 602 S.E.2d 483, 494 2004) (quoting Restatement (Second) of Torts § 13 (Am. Law Inst. 1965)). "An activity that would otherwise subject a person to liability in tort for assault and battery, however, does not constitute tortious conduct if the actor is *privileged* to engage in such conduct." *Hutchinson v. West Virginia State Police*, 731 F.Supp.2d 521, 547 (S.D. W.Va. 2010) (citations omitted) (emphasis added).

The Leonards allege that one of the deputy defendants intentionally choked Mr. Leonard while he was handcuffed on the ground [Doc. 50 at ¶ 27]. Medina and Shingleton assert that because the detention was a lawful, objectively reasonable measure, the force used was reasonable, and thus, Mr. Leonard has failed to state a claim upon which relief can be granted. Medina and Shingleton rely upon *Lowe v. Spears*, No. 3:06-cv-647, 2009 WL 1393860, at *6 (S.D. W.Va. May 15, 2009), which states that "[u]nder West Virginia law,

the plaintiffs do not allege "enough facts to state a claim to relief that is plausible on its face").

as under federal law an officer may use the amount of force necessary to bring an arrestee under his control." *Id*. ("Resistance of the sheriff's *lawful arrest* was unlawful . . . when he refused to submit, it was the officer's right to continue his efforts, using such reasonable force as was necessary to subdue") (quoting *State v. Weisengoff*, 85 W. Va. 271, 101 S.E. 450, 455-56 (1919) (emphasis added)).

This authority refers to the use of reasonable force in an otherwise *lawful* arrest. *See Posey v. Davis*, No. 11-1204, 2012 WL 5857309, at *5 (W. Va. Nov. 16, 2012) (holding that "since the law recognizes that police are entitled to use a reasonable amount of force when *lawfully* seizing a suspect, and the use of force against Plaintiff was reasonable, the defendants are entitled to summary judgment as to any cause of action for assault and battery" (emphasis added)). Based on the bare facts alleged in the Amended Complaint, it is unclear whether an arrest, lawful or otherwise, occurred, and thus this authority is not determinative at this stage. The Leonards have sufficiently pleaded a claim of battery against Medina and Shingleton at this time, because they have alleged that Medina and Shingleton acted with the intent to cause, and did directly cause, harmful contact to Mr. Leonard when they forcibly pulled him outside, handcuffed him, and choked him. Further, the defendants have done little to shed any light on whether Mr. Leonard resisted the deputy after he was handcuffed, thereby making it questionable whether such force was reasonable.

Next, "[a]n actor is subject to liability to another for assault if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent

apprehension." ***Stanley***, 216 W. Va. at 51, 602 S.E.2d at 494. "Stated simply, assault occurs when one person puts another in reasonable fear or apprehension of an imminent battery . . .." ***Hutchinson***, 731 F.Supp.2d at 547.

In both the Amended Complaint and the Leonards' response, it is unclear at what point they allege facts supporting the elements of assault, and it appears that they have not. In the response to Medina and Shingleton's Motion to Dismiss, the Leonards state that "Count 6 (there is no 'Count 5') of the Amended Complaint pleads all the elements of Mr. Leonards' state-law claim of assault and battery against the deputy defendants, and the specific facts alleged clearly support this claim that the deputies intended to cause an offensive contact with Mr. Leonard, and did so." [Doc. 81 at 4]. Based on this, and the lack of other allegations relating to the elements of assault, Mr. Leonard has only asserted a claim for battery.

The Leonards have alleged the bare minimum necessary to plead a plausible claim of battery, and have failed to state facts sufficient to support a plausible claim for assault, and thus the Motion to Dismiss as to Count Six of the Amended Complaint is **DENIED** as to the battery claim and **GRANTED** as to the assault claim.

### 3. Civil Conspiracy

The Leonards allege that Medina, Shingleton, and their co-defendants engaged in a civil conspiracy. West Virginia law defines civil conspiracy as "a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means." ***Dunn v. Rockwell***, 225 W. Va. 43, 56, 689 S.E.2d 255, 268 (2009) (quoting ***Dixon v. American Indus. Leasing Co.***, 162

W. Va. 832, 253 S.E.2d 150, 152 (1979)). "At its most fundamental level, a 'civil conspiracy' is 'a combination to commit a tort.'" *Id.* (citations omitted). Civil conspiracy is not an independent action, because "[t]he cause of action is not created by the conspiracy but by the wrongful acts done by the defendants to the injury of the plaintiff." *Id.* "In order for civil conspiracy to be actionable it must be proved that the defendants have committed some wrongful act or have committed a lawful act in an unlawful manner to the injury of the plaintiff." *Dixon*, 253 S.E.2d at 150. Civil conspiracy is "a legal doctrine under which liability for a tort may be imposed on people who did not actually commit a tort themselves but who shared a common plan for its commission with the actual perpetrator(s)." *Dunn*, 689 S.E.2d at 269.

The Court should grant a motion to dismiss a civil conspiracy claim when the plaintiffs allege that the defendants "engaged in a civil conspiracy" and "individually and collectively" committed wrongs, but do not allege facts to support that allegation. *Tucker v. Thomas*, 853 F.Supp.2d 576, 594 (N.D. W.Va. 2012). The Leonards allege that (1) Medina and Shingleton met their co-defendants in a parking lot behind the Harrison County Courthouse and "conspired and planned to carry out a surprise raid on the Leonards"; (2) drove to the Leonards' residence together; (3) assisted in the removal of the children pursuant to W.Va. § 49-6-3(c); and (4) that the deputy defendants' actions "were unlawful acts in furtherance of an unlawful conspiracy to commit such acts between themselves and with defendants Starkey, Ware and Garvin." [Doc. 50 at pp. 5-6, 8].

The Leonards do not allege a specific tort underlying the civil conspiracy, and the only remaining tort claim is battery in Count Six. The Leonards contend that:

Count 7 pleads all the elements of the plaintiffs' joint claims against the individual defendants for civil conspiracies under West Virginia law- i.e., that the individual defendants joined together to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, that acts were taken in furtherance of said conspiracies by one or more of the defendants, and caused both plaintiffs damages . . . The facts alleged in the Amended Complaint clearly support a prima facie case of civil conspiracy.

[Doc. 83 at 4].

It is unclear how the Leonards' allegations that Medina, Shingleton, and their co-defendants met in a parking lot and "conspired and planned to carry out a surprise raid" would support a *prima facie* case of civil conspiracy to commit battery, and how this claim would be actionable by Mrs. Leonard given that she has no valid claim based on the only available underlying tort of battery.

The Leonards have also alleged that "Walker directed, and Starkey and Ware carried out with the assistance of Garvin, Shingleton and Medina, an [sic] conspiracy to remove the Leonards' grandchildren from the plaintiffs' lawful court-ordered custody under the pretext of doing so pursuant to W.Va. Code § 49-6-3(c), and to violate the Leonards' constitutional rights to be free from unreasonable searches and seizures." [Doc. 81 at 2]. On this basis, it appears the Leonards' contend, in part, that Medina, Shingleton, and their co-defendants conspired to violate W.Va. Code § 49-6-3(c) by unlawfully removing the Leonards' grandchildren from their custody. As an initial matter, "a 'civil conspiracy' is 'a combination to commit a tort.'" ***Dunn***, 689 S.E.2d at 269. The Leonards have not pleaded facts to support a violation of this statute or that a violation of this statute would create a cause of action in tort. Rather, they make only a conclusory allegation that the statute was

violated; accordingly, civil conspiracy on this basis is not actionable. *See Dixon*, Syl. Pt. 1, 253 S.E.2d at 152 ("for civil conspiracy to be actionable it must be proved that the defendants have committed some wrongful act or have committed a lawful act in an unlawful manner to the injury of the plaintiff").

Next, the Leonards appear to assert that the defendants conspired to violate their constitutional rights to be free from unreasonable searches and seizures. To successfully assert this claim, the Leonards must plausibly state a claim that Medina and Shingleton acted jointly in concert and performed an overt act in furtherance of the conspiracy which resulted in the deprivation of their constitutional right to be free from unreasonable searches and seizures. *See Hinkle v. City of Clarksburg, W. Va.*, 81 F.3d 416, 421 (4th Cir. 1996) (citing *Hafner v. Brown*, 938 F.2d 570, 577 (4th Cir. 1992)). "Further, the proponent of a civil conspiracy claim must produce at least circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective and mutual agreement." *Ash v. Allstate Ins. Co.*, No. 12-1533, 2013 WL 5676774, at *5 (W. Va. Oct. 18, 2013) (citing *Wenmoth v. Duncan*, No. 3:08-cv-182, 2009 WL 2707579, at *5 (N.D. W.Va. Aug. 26, 2009)).

Here, the Leonards allege that Medina and Shingleton conspired with others to deprive them of their constitutional right to be free from unreasonable searches and seizures. In support, the Leonards allege that: (1) "defendants Starkey, Ware and Garvin met with defendant Medina and/or defendant Shingleton in the parking lot . . . and they conspired and planned to carry out a surprise raid on the Leonards at their home without any prior notice"; (2) "on March 14, 2012 defendants Starkey, Ware, Garvin, Walker,

Medina and Shingleton each knew they did not personally have any such warrant or order authorizing any such actions"; (3) "[w]orking in concert together at the Leonard residence on March 14, 2012 for the unlawful purpose of aiding the entry of defendants Starkey, Ware and Garvin into the home without [consent or permission for entry or removal of children], and knowing they did not have a warrant or a court order authorizing [their actions, one of the defendants reached into the home and removed Mr. Leonard, and handcuffed him]"; (4) their co-defendants entered the home with the purpose of searching and removing the children, and once inside "Starkey, Ware and Garvin, working in concert together, seized items of personal and took custody of the two children"; and (5) the "[a]ctions of defendants Medina and Shingleton alleged above were . . . unlawful acts in furtherance of an unlawful conspiracy to commit such unlawful acts between themselves and [the other defendants]". [Doc. 50 at 5-8].

Together, these allegations may be read as to assert that defendants Medina and Shingleton conspired or acted jointly with others to knowingly and unlawfully enter the Leonards' home without a warrant. On this basis, the plaintiffs have alleged a cognizable § 1983 claim against Medina and Shingleton for civil conspiracy to unreasonably search the Leonards' home. Accordingly, the Motion to Dismiss as to the § 1983 civil conspiracy claim in Count Seven is **DENIED.**

## **CONCLUSION**

For the reasons discussed above, the Court:

- **DENIES WITHOUT PREJUDICE** Medina and Shingleton's Motion to Dismiss [Doc. 77], as to the § 1983 unlawful entry claims in Counts 1 and 2;

- **DENIES WITHOUT PREJUDICE** the Motion to Dismiss based on immunity;

- **GRANTS** Medina and Shingleton's Motion to Dismiss and **DISMISSES** Counts 3 and 4 insofar as these Counts pertain to the deputy defendants;

- **GRANTS** Medina and Shingleton's Motion to Dismiss and **DISMISSES** the assault claim in Count 6;

- **DENIES** Medina and Shingleton's Motion to Dismiss the battery claim in Count 6;

- **DENIES** Medina and Shingleton's Motion to Dismiss the civil conspiracy claim in Count 7 insofar as it pertains to § 1983 conspiracy; and

- **GRANTS** Medina and Shingleton's Motion to Dismiss the civil conspiracy claims in Count 7 insofar as they pertain to all other claims except the Section 1983 conspiracy.

It is so **ORDERED**.

The Court directs the Clerk to transmit copies of this Order to counsel of record.

**DATED**: December 8, 2015.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE