IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG

**PAULA L. LEONARD** and
**ROBERT P. LEONARD,**

        Plaintiffs,

v.                                                               CIVIL ACTION NO. 1:14-CV-42
                                                                    (Judge Bailey)

**SARAH STARKEY, BRENDA WARE,**
**TERRY WALKER, COTY SHINGLETON,**
and **JAMES J. MEDINA, II,**

        Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS JAMES J. MEDINA, II'S AND COTY SHINGLETON'S MOTION FOR SUMMARY JUDGMENT

        Pending before this Court is Defendants James J. Medina, II's and Coty Shingleton's ("deputy defendants") Motion for Summary Judgment [Doc. 117], which was filed October 14, 2016. The plaintiffs filed their Response in Opposition [Doc. 124] on November 6, 2016. The deputy defendants filed their Reply brief [Doc. 127] on November 21, 2016. Subsequently, with leave of this Court, plaintiffs filed a surreply on December 1, 2016 [Doc. 132]. This matter is now ripe for adjudication. For the reasons that follow, the Court **GRANTS** defendants Medina and Shingleton's Motion for Summary Judgment **[Doc. 117]**.

## BACKGROUND

**A. Factual Background**

Robert Leonard ("Mr. Leonard") and Paula Leonard ("Mrs. Leonard") filed a petition in the Circuit Court of Harrison County, West Virginia, alleging parental abuse and/or neglect of the Leonards' two grandchildren. Julie Garvin ("Garvin")[1] was appointed as the guardian *ad litem* for the children in the action ("the child abuse case"), and Sarah Starkey ("Starkey") and Brenda Ware ("Ware") were Child Protective Services ("CPS") workers assigned by their supervisor, Terri Walker ("Walker"), to the case [Doc. 50 at ¶ 4]. Upon conclusion of the child abuse case, the Leonards were granted physical custody of their grandchildren; the Leonards did not receive legal custody, which remained with the WVDHHR.[2] [Id.].

The Leonards allege that "defendants Garvin and Starkey, and possibly Walker," had planned for Starkey to conduct a home visit without notice prior to March 14, 2012; Mr. Leonard refused entry, and "later asserted in court papers filed in the child abuse case . . . that he has a constitutional right to refuse a government agent's entry into his home if the agent does not have a warrant or court order authorizing the entry." [Id.].

Following Starkey's unsuccessful home visit, Starkey, Ware, and Garvin allegedly planned to "remove the children from the Leonards' lawful court-ordered physical custody by force aided by the assistance of law enforcement under color of CPS authority" [id. at

---

[1] In a previous Order [Doc. 91], this Court found defendant Garvin was entitled to immunity and dismissed her from this action.

[2] In a previous Order [Doc. 95], this Court found defendant WVDHHR could not be held vicariously liable; accordingly, it was dismissed from this action.

¶ 5], with "the approval of and under the direction of defendant Walker." [Id.]. On March 14, 2012, the West Virginia State Police launched a criminal investigation of Mr. Leonard based upon his daughter's allegation that he had sexually molested her when she was a child [Doc. 118-4, Ware Decl. ¶ 5].

Starkey called the Harrison County 911, identified herself as a CPS worker, and requested assistance in the removal, indicating that she anticipated problems at the residence [Doc. 115 Ex. E, Starkey Decl. ¶ 6; Ex. F, Harrison/Taylor County CAD Incident Report]. Specifically, a social worker had informed the deputy defendants that Mr. Leonard was under criminal investigation for allegedly molesting his daughter, that he had guns and might use them, that he had previously threatened to harm the children, and that there was fear of a hostage situation if CPS attempted to remove the children. [Doc. 115 Ex. C, Garvin Decl. ¶ 10; Ex. E, Starkey Decl. ¶ 7].

Harrison County Deputy Sheriff Shingleton was dispatched to meet Starkey, Ware and Garvin in the parking lot behind the Harrison County Courthouse to accompany them to the Leonards' home. [Doc. 118-7 Ex. G, Shingleton Decl. ¶ 4]. Shingleton contacted Deputy Medina for assistance. [Doc. 118-8 Ex. H, Medina Decl. ¶ 4]. The defendants all arrived at the Leonards' home around 6:21 p.m. The deputy defendants each arrived in their law enforcement vehicles, while Starkey, Ware and Garvin arrived in one car together. [Id.]. The deputy defendants, who were in their uniforms and armed, approached the Leonards' home, where Mr. Leonard was present. [Id. at ¶ 6]. The deputies asked Mr. Leonard to exit the home, but Mr. Leonard asked if they had a warrant and then refused to exit the home. [Doc. 124-2, Robert P. Leonard Decl. ¶ 8]. Further, the deputies could see the children in the home, and Mr. Leonard was blocking access to them. [Doc. 118-7

Ex. G, Shingleton Decl. ¶ 11]. Deputy Medina then reached into the home and escorted Mr. Leonard outside by his wrists to search and detain him. [Doc. 118-8, Medina Decl. ¶ 11]. Finally, Deputy Medina testified that he believed his warrantless entry into the home to separate Mr. Leonard from the children was justified by the exigent circumstances exception. [Ex. M 14:21-15:14].

The Leonards allege that deputy Shingleton "intentionally and maliciously choked" Mr. Leonard while he was restrained on the ground. [Doc. 50]. After Mr. Leonard was restrained, Starkey, Ware, and Garvin entered the home to retrieve the children and a few of their belongings. [Doc. 118-7 Ex. G, Shingleton Decl. ¶ 12]. Garvin and Shingleton then took the children directly to the Harrison County Courthouse for emergency removal proceedings pursuant to W.Va. Code § 49-6-3(c). [Id. at ¶ 15].

### B. Procedural Background

On March 12, 2014, the Leonards filed suit in this Court against Starkey, Ware, Walker, Garvin, Shingleton, Medina, and the West Virginia Department of Health and Human Resources ("WVDHHR") [Doc. 1]. On October 7, 2014, Judge Irene M. Keeley[3] heard oral argument on the previous motions to dismiss [Doc. 43], and denied the same without prejudice. [Id.]. The Court ordered the Leonards to file an amended complaint, [Id. at 2], which they did on December 1, 2014, alleging the following [Doc. 50]:

- **Counts 1 and 2:** Violation of the Leonards' right to be free from unreasonable searches and seizures under the Fourth and Fourteenth

---

[3] This matter was transferred to the undersigned judge on September 22, 2015 [Doc. 90].

Amendments, pursuant to 42 U.S.C. § 1983 (against Starkey, Ware, Walker, Garvin, Shingleton and/or Medina);

- **Counts 3 and 4:** Intentional Infliction of Emotional Distress (against Starkey, Ware, Walker, Garvin, Shingleton, and/or Medina);[4]

- **Count 6:** Assault and Battery (against Shingleton and/or Medina);

- **Count 7:** Civil Conspiracy (against Starkey, Ware, Walker, Garvin, Shingleton, and Medina); and

- **Count 8:** Vicarious Liability (against defendant WVDHHR).

On May 1, 2015, defendants Medina and Shingleton filed a Motion to Dismiss [Doc. 77], arguing that the Leonards did not plead sufficient facts to state a claim upon which relief could be granted, or to overcome the defendants' statutory and qualified immunity. In its Order on the deputy defendants' Motion to Dismiss, this Court ruled as follows:

- **DENIED WITHOUT PREJUDICE** Medina and Shingleton's Motion to Dismiss [Doc. 77], as to the § 1983 unlawful entry claims in Counts 1 and 2;

- **DENIED WITHOUT PREJUDICE** the Motion to Dismiss based on immunity;

- **GRANTED** Medina and Shingleton's Motion to Dismiss and **DISMISSED** Counts 3 and 4 insofar as these Counts pertain to the deputy defendants;

- **GRANTED** Medina and Shingleton's Motion to Dismiss and **DISMISSED** the assault claim in Count 6;

- **DENIED** Medina and Shingleton's Motion to Dismiss the battery claim in Count 6;

---

[4] There is no "Count 5" listed in the Amended Complaint.

- **DENIED** Medina and Shingleton's Motion to Dismiss the civil conspiracy claim in Count 7 insofar as it pertains to § 1983 conspiracy; and
- **GRANTED** Medina and Shingleton's Motion to Dismiss the civil conspiracy claims in Count 7 insofar as they pertain to all other claims except the Section 1983 conspiracy.

The deputy defendants now move for summary judgment on the remaining claims.

## **LEGAL STANDARD**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see **Celotex Corp. v. Catrett**, 477 U.S. 317, 322 (1986). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 248 (1986). Thus, the Court must conduct "the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." **Anderson**, 477 U.S. at 250.

Additionally, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." **Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.**, 475 U.S. 574, 586 (1986). That is, once the movant has met its burden to show absence of material fact, the party opposing summary judgment

6

must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial. Fed. R. Civ. P. 56(c); **Celotex Corp.**, 477 U.S. at 323-25; **Anderson**, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." **Anderson**, 477 U.S. at 249 (citations omitted).

## ANALYSIS

The following claims remain against defendants Shingleton and Medina: (1) violations of plaintiffs' Fourth and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983; (2) battery; and (3) Section 1983 civil conspiracy. Shingleton and Medina argue that they are entitled to qualified immunity from the Section 1983 claim and the related civil conspiracy claim because no clearly established law prohibited their actions; plaintiffs have no evidence that defendants conspired to carry out an unlawful act against the plaintiffs; and that they are entitled to summary judgment because plaintiffs have no credible evidence that the deputy defendants used excessive force while briefly detaining Mr. Leonard [Doc. 115-2 at 2].

**A.    Statutory Immunity**

Shingleton and Medina argue that they are entitled to statutory immunity as to the state law claims pursuant to the Act. W.Va. Code § 29-12A-5(b). Statutory immunity "is an immunity from suit rather than a mere defense to liability [that] . . . is effectively lost if the case is erroneously permitted to go to trial." **Hutchison v. City of Huntington**, 198 W. Va. 139, 147, 479 S.E.2d 649, 657 (1996) (internal citations omitted). "[I]mmunities under West Virginia law are more than a defense to a suit in that they grant governmental bodies

and public officials the right not to be subject to the burden of trial at all. The very heart of the immunity defense is that it spares the defendant from having to go forward with an inquiry into the merits of the case." *Id*.

"The ultimate determination of whether . . . statutory immunity bars a civil action is one of law for the court to determine." **State ex rel. Town of Pratt v. Stucky**, 229 W. Va. 700, 706, 735 S.E.2d 575, 581 (2012). Under the Act, "[a] political subdivision is immune from liability if a loss or claims results from . . . the failure to provide, or the method of providing, police, law enforcement or fire protection." W.Va. Code § 29-12A-5(a)(5). A political subdivision is defined as follows:

> [A]ny county commission, municipality and county board of education; any separate corporation or instrumentality established by one or more counties or municipalities, as permitted by law; any instrumentality supported in most part by municipalities; any public body charged by law with the performance of a government function and whose jurisdiction is coextensive with one or more counties, cities or towns; a combined city-county health department created pursuant to article two, chapter sixteen of this code; public service districts; and other instrumentalities including, but not limited to, volunteer fire departments and emergency service organizations as recognized by an appropriate public body and authorized by law to perform a government function: Provided, That hospitals of a political subdivision and their employees are expressly excluded from the provisions of this article.

W.Va. Code § 29-12A-3(c).

The Harrison County Sheriff's Commission qualifies as a political subdivision under the Act as a public body "charged by law with the performance of a government function." *See* **State ex rel. City of Bridgeport v. Marks**, 223 W. Va. 449, 455, 759 S.E.2d 192, 198 (2014). An employee of a political subdivision is immune from liability unless: "(1) his acts

8

or omissions were manifestly outside the scope of employment or official responsibilities; (2) his . . . acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or (3) liability is expressly imposed upon the employee by a provision of this code." W.Va. Code §§ 29-12A-5(b)(1)-(3).

An employee behaves in a wanton or reckless manner when he or she "has intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." **Holsten v. Massey**, 200 W. Va. 775, 789, 490 S.E.2d 864, 878 (1997). The Supreme Court of Appeals of West Virginia has previously defined "malice" as "[t]he intentional doing of a wrongful act without just cause or excuse, with an intent to inflict injury or under circumstances that the law will imply an evil intent . . . A condition of the mind showing a heart regardless of social duty and fatally bent on mischief." **State v. Burgess**, 205 W. Va. 87, 89, 516 S.E.2d 491, 493 (1999) (quotations omitted).

In **Hylton v. Bennett**, No. 12-0194, 2012 WL 5834621, at *2 (W. Va. Nov. 16, 2012), the Supreme Court of Appeals of West Virginia affirmed the circuit court's dismissal with prejudice where the defendants were entitled to statutory immunity from the claims. **Id**. The Supreme Court concluded that, "[a]lthough petitioners allege in their complaint that respondents [engaged in allegedly unlawful behavior] 'maliciously and without probable cause . . .' the Complaint is devoid of any factual assertions to support this bald claim of malice[,]" and thus the respondents were entitled to statutory immunity. **Id**.

9

The Leonards expressly allege that "at all times material to the Claims made herein [defendants Medina and Shingleton were] employed by Harrison County, West Virginia as . . . Harrison County Deputy Sheriff[s]." [Doc. 50 at ¶¶ 3, 11-12]. Accordingly, the Leonards expressly "do not dispute that the defendant deputies are employees of a 'political subdivision' as defined by the statute." [Doc. 81 at 6].

### i. Battery

The Leonards allege that deputy Shingleton intentionally and maliciously threw Mr. Leonard on the ground and choked him. [Doc. 50 at ¶ 27]. All defendants have stated that the Deputy Defendants did not throw Mr. Leonard on the ground upon removal from the home. (Ex. G, Shingleton Decl. ¶ 11; Ex. H, Medina Decl. ¶ 11; Ex. C, Garvin Decl. ¶ 12; Ex. D, Ware Decl. ¶ 11; Ex. E, Starkey Decl. ¶ 8). Mr. Leonard testified at his deposition that the Deputy Defendants threw him to the ground on his side. (Ex. A, Robert Leonard Dep. 25:23-26:7). He told medical staff the next day, however, that he did not recall what had happened. (Ex. K, at CS&JM 00315). Similarly, Mrs. Leonard contradicts her own testimony and that of her husband. In her deposition, she testified that he was on his knees rather than his side. (Ex. B, Paula Leonard Dep. 17:24-18:22). During the abuse and neglect proceedings, Mrs. Leonard testified that her husband was not knocked to the ground, but tripped and fell to his knees. (Ex. N, Tr. of Hr'g Apr. 30, 2012, 222:24-223:8). Additionally, Mr. Leonard had told the hospital that his wife did not see what happened. (Ex. K, at CS&JM 00315). This Court has carefully reviewed these medical records and sees that Mr. Leonard told them it was actually an unidentified neighbor who told him he was thrown to the ground. (Id.). This person, however, has not been listed as a witness.

10

Additionally, only Mr. Leonard has testified that he was choked. Again, however, Mr. Leonard contradicts his own testimony. In the Amended Complaint, Mr. Leonard alleges he was choked immediately after being removed from the house and taken to the ground, and while he was still on the ground [Doc. 50 at ¶ 27]. However, Mr. Leonard testified at his deposition that Deputy Shingleton choked him after he was placed on the swing. (Ex. A, Robert Leonard Dep. 43:12-44:2). And again, his medical records show that he did not remember anything about the event. (Ex. K, at CS&JM 00315).

Upon consideration of the above, this Court finds the deputy defendants are immune from liability because there is simply no evidence that "(1) [their] acts or omissions were manifestly outside the scope of employment or official responsibilities; (2) [their] . . . acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or (3) liability is expressly imposed upon the employee by a provision of this code." W.Va. Code §§ 29-12A-5(b)(1)-(3). Accordingly, the deputy defendants are entitled to summary judgment as to the battery claim.

**B.     Qualified Immunity**

Deputies Medina and Shingleton argue that the Leonards' § 1983 claims must be dismissed because qualified immunity bars the claim. Section 1983 allows for a plaintiff to assert a claim against any "person" who, acting under color of state law, "depriv[ed] [another] of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. A plaintiff seeking to bring a claim under § 1983 must meet two requirements: (1) the conduct complained of was committed by a person acting under color of law; and (2) the conduct deprived the plaintiff of rights, privileges, or immunities secured to him by the

Constitution and the laws of the United States.  See **Wirth v. Surles**, 562 F.2d 319, 321 (4th Cir. 1977) (citing **Monroe v. Pape**, 365 U.S. 167 (1961)).

"Qualified immunity protects an officer from liability or, in many instances, from having to stand trial when the officer makes a decision that even if constitutionally deficient, 'reasonably misapprehends the law governing the circumstances she confronted.'" **Hutchinson v. Lemmon**, 436 Fed.Appx. 210, 214 (4th Cir. 2011) (quoting **Brosseau v. Haugen**, 543 U.S. 194, 198 (2004)).  "[A] plaintiff may prove that an official has violated his rights, but an official is nonetheless entitled to qualified immunity if a reasonable person in the official's position could have failed to appreciate that his conduct would violate those rights."  **Torchinsky v. Siwinski**, 942 F.2d 257, 261 (4th Cir. 1991).  This is particularly important in the law enforcement field, where the ability of police officers "to protect the public can be severely hampered . . . if their every decision is subject to second-guessing in a lawsuit."  **Id**.  Accordingly, qualified immunity acts to protect "all but the plainly incompetent or those who knowingly violate the law."  **Malley v. Briggs**, 475 U.S. 335, 341 (1986).

As an initial matter, this Court must identify whether any statutory or constitutional rights were violated and then ask whether those rights were clearly established at the time of the violation.  **Pearson v. Callahan**, 555 U.S. 223, 232 (2009); **Hunter v. Town of Mocksville, N.C.**, 789 F.3d 389, 396 (4th Cir. 2015).  This Court, in its discretion, may decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  **M.C. ex rel. Crawford v. Amrhein**, 598 Fed.Appx. 143, 146 (4th Cir. 2015) (citing **Pearson**, 555 U.S. at 236).

### 1. Unreasonable Search

The Leonards allege that "[w]hen the deputies, without a warrant or exigent circumstances as alleged, opened the door and entered the sanctity of the home of Mr. Leonard <u>and</u> Mrs. Leonard in order to grab and pull Mr. Leonard from the home . . . the deputies . . . violated the expectations of privacy [the Leonards] have in their home against any warrantless intrusion."  [Doc. 81 at 16] (emphasis in original).  On this basis, the Leonards argue a Fourth Amendment violation against the deputies under § 1983. [Id.].

#### i. Clearly Established Right

Fourth Amendment protections are triggered when the State intrudes into an area "in which there is a 'constitutionally protected reasonable expectation of privacy.'" **New York v. Class**, 475 U.S. 106, 112 (1986) (citing **Katz v. United States**, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)).  "Because individuals ordinarily possess the highest expectation of privacy within the curtilage of their home, that area typically is 'afforded the most stringent Fourth Amendment protection.'" **United States v. Taylor**, 90 F.3d 903, 908 (4th Cir. 1996) (quoting **United States v. Martinez-Fuerte**, 428 U.S. 543, 561 (1976)). "With few exceptions, the question of whether a warrantless search of a home is reasonable and hence constitutional must be answered no."  **Kyllo v. United States**, 533 U.S. 27, 31 (2001) (citations omitted).

The right to be secure in one's home from warrantless and forcible intrusion in the absence of exigent circumstances is clearly established.  In **Payton v. New York**, 445 U.S. 573, 590 (1980), the Supreme Court stated that "the Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not

be reasonably crossed without a warrant." *Id*. Thus, at the time of the intrusion, there was clearly established law from the Supreme Court prohibiting Medina and Shingleton's admittedly minimal entry into the Leonards' home without a warrant or *exigent circumstances*.

### ii. Violation of Constitutional Right

The Leonards claim that their constitutional rights were violated when Medina and Shingleton, acting under color of state law, entered their home without a warrant, exigent circumstances, or other authorization, in violation of the Fourth Amendment. "It is a 'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'" **Brigham City v. Stuart**, 547 U.S. 398, 403 (2006) (quoting **Groh v. Ramirez**, 540 U.S. 551, 559 (2004)). However, "because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Id*. at 403. Notably, "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify the action." *Id*. at 404 (citations omitted). "[A] search or seizure carried out on a suspect's premises without a warrant is *per se* unreasonable, unless the police can show . . . the presence of 'exigent circumstances.'" **Coolidge v. New Hampshire**, 403 U.S. 443, 474-75 (1971). An "exigent circumstance" exists when "real immediate and serious consequence" could occur if the police delay their action in order to obtain a warrant. **Welsh v. Wisconsin**, 466 U.S. 740, 751 (1984) (citations omitted).

"In analyzing whether exigent circumstances justified a warrantless search, we ask whether the circumstances would cause an officer to have an 'objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within.'" *United States v. Hill*, 649 F.3d 258, 265 (4th Cir. 2011) (quoting *United States v. Moss*, 963 F.2d 673, 678 (4th Cir. 1992)). The Supreme Court has specifically identified exigencies that may justify a warrantless search of a home. *Kentucky v. King*, 563 U.S. 452 (2011); *see, e.g., Ker v. California*, 374 U.S. 23, 40 (need "to prevent the imminent destruction of evidence" is sufficient justification for a warrantless search); *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (warrantless entry was permissible to render emergency assistance to an injured person or to protect an occupant from imminent injury); *United States v. Santana*, 427 U.S. 38, 42-43 (1976) (warrantless entry permissible when officers are in hot pursuit of fleeing suspect).

In *United States v. Turner*, 650 F.2d 526 (4th Cir. 1981), the Fourth Circuit provided enumerated factors relevant to a district court's determination of exigent circumstances:

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors or the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband.

*Turner*, 650 F.2d at 528 (citing *United States v. Rubin*, 474 F.2d 262, 268 (3d Cir. 1973)).

Plaintiffs believe the deputy defendants should not simply have relied on the CPS workers' information. "But to accept arguments like these would be to put too great a

15

burden on officers tasked with responding to emergencies. There is a danger that in the light of day we can forget that in emergencies, 'the business of policemen and firemen is *to act*, not to speculate or meditate on whether the report is correct . . . . When policemen, firemen, or other public officers are confronted with evidence which would lead a prudent and reasonable official to see a need to act to protect life or property, they are authorized to act on that information, even if ultimately found erroneous.' **Wayne v. United States**, 318 F.2d 205, 212 (D.C. Cir. 1963)(Burger, J.)." **Hunsberger v. Wood**, 570 F.3d 546 (4th Cir. 2009)(emphasis in original). "While it is tempting to second-guess an officer's actions, it is also true that real harm to persons and property could result 'if police tried to act with the calm deliberation associated with the judicial process.'" *Id*. at 557.

Medina and Shingleton were dispatched by 911 for an emergency removal. A social worker had informed the deputy defendants that Mr. Leonard was under criminal investigation for allegedly molesting his daughter, that he had guns and might use them, that he had previously threatened to harm the children, and that there was fear of a hostage situation if CPS attempted to remove the children. [Doc. 115 Ex. C, Garvin Decl. ¶ 10; Ex. E, Starkey Decl. ¶ 7]. When Medina and Shingleton arrived at the home and requested that Mr. Leonard come outside, Mr. Leonard asked if they had a warrant and then refused to exit the home. Further, the deputies could see the children in the home, and Mr. Leonard was blocking access to them. [Doc. 118-7 Ex. G, Shingleton Decl. ¶ 10]. Deputy Medina then reached into the home and pulled Mr. Leonard outside by the wrists to search and detain him. [Doc. 118-7 Ex. H, Medina Decl. ¶ 11]. Finally, Deputy Medina

testified that he believed his warrantless entry into the home to separate Mr. Leonard from the children was justified by the exigent circumstances exception. [Ex. M 14:21-15:14].

This Court finds that the above facts and circumstances known to the deputy defendants would create an "objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons [] within." **United States v. Moss**, 963 F.2d 673, 678 (4th Cir. 1992). Because this Court "conclude[s] that defendant[s] did not violate the Fourth Amendment, [it] need not proceed to ask whether the alleged right was clearly established. **Pearson**, 129 S.Ct. at 818. There is a significant overlap between a Fourth Amendment analysis and a qualified immunity inquiry; both are ultimately concerned with reasonableness. [Deputy defendants'] actions were reasonable and [they] therefore deserve[] immunity from money damages." **Hunsberger**, 570 F.3d at 557. Because Shingleton and Medina's response to the emergency they perceived was objectively reasonable, they are entitled to qualified immunity. Accordingly, the Motion to for Summary Judgment is **GRANTED** as to plaintiffs' Section 1983 claims.

Finding no Constitutional violations, this Court further **DISMISSES** the plaintiffs' civil rights conspiracy claims.

**C.     State Law Claim for Battery**

Although this Court has already found Medina and Shingleton are immune, they also move for summary judgment on Mr. Leonard's battery claim because he has failed to show a genuine issue of material fact. As noted above, all defendants have stated that the Deputy Defendants did not throw Mr. Leonard on the ground upon removal from the home.

(Ex. G, Shingleton Decl. ¶ 11; Ex. H, Medina Decl. ¶ 11; Ex. C, Garvin Decl. ¶ 12; Ex. D, Ware Decl. ¶ 11; Ex. E, Starkey Decl. ¶ 8). Additionally, only Mr. Leonard has testified that he was choked. Again, however, Mr. Leonard contradicts his own testimony.

"A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of [the plaintiffs'] testimony is correct." **Barwick v. Celotex Corp.**, 736 F.2d 946, 960 (4th Cir. 1984). This Court finds this is the case. Accordingly, there being no genuine issue as to any material fact, and finding that the deputy defendants are entitled to judgement as a matter of law, the battery claim is **DISMISSED**.

## CONCLUSION

For the reasons discussed above, this Court **GRANTS** Defendants James J. Medina, II's and Coty Shingleton's Motion for Summary Judgment **[Doc. 117]**. These defendants are hereby **DISMISSED** from this action.

It is so **ORDERED**.

The Court directs the Clerk to transmit copies of this Order to counsel of record.

**DATED**: January 24, 2017.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE